# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **SHAWNA SCYOC** | § |
| *Plaintiff* | § |
| | § |
| **vs.** | § |
| | § |
| | § |
| **UBER TECHNOLOGIES, INC.,** | § |
| **RASIER, LLC, AND RASIER-CA,** | § |
| **LLC** | § |
| *Defendants* | § |


## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

    **Plaintiff Shawna Scyoc**, hereinafter called Plaintiff, complains of and about Defendant Uber Technologies, Inc., Defendant Rasier, LLC., and Defendant Rasier-CA LLC, hereinafter "Uber," and for cause of action show unto the Court the following:

## I.    __INTRODUCTION__

    1.    In 2009, when Uber was founded, the general public considered it unreasonably dangerous for a young woman (or any solo driver for that matter) to allow a complete stranger into their private car in order to travel to a specific destination. That would have been considered hitchhiking. A foreseeable risk of hitchhiking was the potential for sexual assault.

    2.    If someone needed a ride, one approach that had long been considered reasonably safe was to hail a licensed taxi. For decades, local authorities have heavily regulated taxi drivers and taxicabs to provide safeguards and protections for prospective taxi drivers against unscrupulous or predatory riders. For example, taxi drivers often have partitions to protect them from dangerous riders, direct communication with taxi companies to inform if an assault may occur, and, as technology progressed, mandatory video recording inside a taxi.

3.      Uber first launched in San Francisco in 2010 as UberCab. At first, it used its mobile phone application to dispatch black Lincoln Town Cars and limousines, operated by licensed professional drivers who worked with regulated, licensed Charter-Party Carrier (TCP) businesses. It branded itself "Everybody's Private Driver."

4.      In 2012, Uber expanded its offerings to include traditional taxi services, and also less expensive rides in unmarked "hybrid and mid-range cars in a variety of colors," still operated by licensed, regulated TCPs. It called these cheaper rides "UberX."

5.      Meanwhile, in 2012, Uber noticed a small, local San Francisco start-up company, Zimride (later re-named Lyft), that facilitated less expensive rides than Uber by harnessing "ridesharing" where trips were provided by random laypersons rather than professional drivers. This was a radical concept, with some obvious risks for drivers. But in 2012, Lyft was growing slowly and deliberately, initially rolling out to just friends and family. It marked the cars with giant fuzzy pink mustaches and encouraged drivers and passengers to "fist bump" upon the passenger entering the car. Payments consisted of a reimbursement for gas, and a suggested donation from the rider to the driver.

6.      Uber, which by then had expanded into markets around the world, saw in Lyft's "ridesharing" concept the potential to make a lot more money and to underpay drivers for their services by identifying them as independent contractors, failing to reimburse drivers for expenses, and failing to pay drivers a fair minimum wage.

7.      In 2013, Uber decided to start offering this novel form of application-supported transportation, where Uber would connect individuals who need a ride with individuals who have a driver's license, access to a car, and willingness to offer a ride (so-called "peer-to-peer rides" or "ridesharing"). For the first time, Uber was connecting riders with drivers who were not associated with licensed taxis or TCPs. However, Uber did not inform Drivers of the risk associated with Uber riders or perform any basic safety analysis of riders who were signing up for their platform.

8.      Uber was not content with a local friends-and-family market like Lyft, nor with slow growth. It on-boarded a massive fleet of drivers practically overnight. Offering an easy and

safe way to earn money on the Uber Platform. Uber Drivers did not know it, but a paradigm shift had occurred. Uber had effectively monetized hitchhiking, all the while hiding that reality from its drivers.

9. Uber's new transportation system was convenient and affordable for the public, and lucrative for Uber. On the other hand, Uber's business model placed a driver who was trusting in Uber's reputation, and a rider about whom the driver and Uber both knew very little, in an isolated setting (a private vehicle) with limited means for the driver to escape if something went awry. This business model foreseeably increased risk of sexual assault to drivers, especially for solo women driving on the platform. Uber should have taken action to prevent such assaults, but chose instead to pursue rapid growth at all costs.

10. In order to keep building this new industry and beat the competition, Uber needed to make the acquisition of drivers and riders as cheap and frictionless as possible. Anything that discouraged riders from using the product would hurt the bottom line.

11. Uber marketed itself to Drivers as being safe: the "safest rides on the road,"[1] "a ride you can trust,"[2] and a service that "was created to ensure reliable access to safe rides[.]"[3] Even today, Uber continues to maintain that "safety is a top priority[.]"[4] This ubiquitous messaging generated reassurance that Uber Drivers could count on Uber to keep them safe. It removed the friction that would otherwise prevent drivers from using Uber's product.

12. The result is a universal understanding by the public that an Uber ride is not a ride with a stranger; it is a ride *with Uber,* arranged and procured *by Uber* , and with trip monitoring and fare management exclusively within the *Uber App.* It is the imprimatur of a legitimate and responsible corporation—Uber— overseeing virtually every aspect of the ride that gives Uber

---

[1] Uber, *Safety*, https://web.archive.org/web/20140701103201/uber.com/safety (archived Jul. 2014).

[2] Uber, *Safety*, https://web.archive.org/web/20180224182422/https://www.uber.com/safety/ (archived Feb. 2017).

[3] Uber, UberIMPACT Report, at 1, https://newsroom.uber.com/wp-content/uploads/madd/uber_DUI_Report_WIP_12.12.pdf.

[4] https://www.uber.com/us/en/about/?campaign_id=427272530&kw=uber%20information&kwid=kwd-76279030966261%3Aloc-190&uclick_id=6f5e58af-b714-4f85-abbe-fe9b056d98b9

Drivers the necessary sense of safety and security to work for Uber. Based on Uber's own metrics, Drivers are largely motivated by safety when choosing Uber's services.[5]

13.     *Second*, Uber had to circumvent the taxi industry's existing safety regulations in order to rapidly recruit a fleet of Drivers to meet this demand.

14.     Uber's business plan required that its drivers never be treated as Uber's employees. If the drivers could establish employee status, then Uber would be on the hook for the associated costs, such as overtime, workers' compensation, unemployment insurance, etc. This motivation in turn informed the company's approach to safety. If Uber effectively controlled the workplace (Uber vehicle), it would have demonstrated Uber's control over those drivers, thereby supporting their employment-based claims.

15.     At every step, Uber's approach to safety reflected its dominant goals of recruiting riders and drivers with as little friction as possible. Uber chose to achieve growth at the expense of women's safety, including women driver safety. When Uber launched its new transportation system, it did not hire any safety experts nor did it spend a single minute or a single dollar thinking about how to prevent sexual assault. To this day, Uber's efforts regarding safety are primarily focused on appearing safe, not actually being safe.

16.     In the past, Uber gained Driver trust by fraudulently advertising "the safest ride on the road," saying that it sets "the strictest standards possible" and that it "aims to go above and beyond local requirements" with "gold standard" of transportation. Even after it paid more than $50 million to settle lawsuits based on this fraudulent marketing, Uber never told drivers the truth about the significant amount of assaults that Uber riders were inflicting on Uber Drivers. Instead, Uber changed its safety representations to be increasingly vague, such as asserting: "At Uber, Safety Never Stops."

17.     Uber knows that its transportation system is particularly high risk for Drivers who transport intoxicated riders. Nonetheless, Uber's advertising disproportionately targets intoxicated riders with dedicated ad campaigns and webpages devoted to taking Uber Rides

---

[5] Uber, 2019 S-1 at 154,
https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm.

when a perspective passenger has been drinking. Despite this, Uber never informed drivers of the increased risk to driving for Uber if a passenger is under the influence of alcohol and/or drugs.

18. Uber allows any accountholder to order a ride for any person. This means that any account holder can order a trip for an anonymous rider and the Driver is confronted with someone getting into their vehicle who is not named to them prior to pick-up. Uber's system penalizes Drivers who cancel trips and will deactivate Drivers if their "cancellation rate" rises above a threshold that Uber sets. This means that Drivers, who rely on Uber for their livelihoods, cannot cancel any trip they desire for fear of being deactivated if their cancellation rate becomes unacceptable to uber.

19. Uber has known for years that mandatory cameras would effectively deter sexual assault on its system for women drivers. It knows that cameras would help women drivers report sexual assaults with more confidence that they could prove their claims. But it also knows that requiring cameras would jeopardize Uber's argument that drivers are independent contractors.

20. Uber does not adequately monitor riders' safety performance or provide Uber Drivers with information known to Uber about a dangerous rider. Uber makes it hard for drivers to report sexual assault, since it does not want to disclose the true safety risks to regulators or the public. By impeding reports of sexual assault, Uber fails to protect drivers from riders it should remove from the system. Uber also deprives itself of the true data on sexual assault, preventing it from meaningfully studying prevention.

21. Uber also misleads drivers by displaying each rider's purported overall rating (out of five stars). But the star rating actually reflects only reflects a specific number of past trips, is not a complete track record. Moreover, Uber drops some low reviews from the overall star rating it displays of riders. It does not tell Drivers that this information is incomplete and inflated.

22. Uber does not protect drivers from riders who have shown themselves to be a threat. Uber's system tracks many different types of dangerous activities that Uber Platform Users perform, but Uber does not inform Drivers of any past dangerous activities that Riders perform while using the Uber system.

23.     Even though sexual assault is underreported, and even though Uber discourages reporting, thousands of women, both Drivers and Riders, have come forward to say they were sexually assaulted during Uber rides. Uber refuses to take any responsibility for allowing these assaults to occur.

24.     In fact, Uber's legal position is and always has been starkly different from what it tells the public. Uber pretends that it takes responsibility for the safety of its rides. Its in-App welcome screen long promised prospective customers, "Safe, reliable rides in minutes." To this day, Uber's website proclaims: "Drive with confidence. You deserve to be able to go wherever the opportunity is. Get there with support on the road and technology that helps protect you and those around you… Your safety drives us…"[6]

25.     In contrast to these representations, Uber has aggressively lobbied for the enactment of laws and regulations saying that Uber is merely a technology platform, or a middleman between riders and drivers, and that it does not control, direct, or manage its drivers and so cannot be held culpable for what occurs during a ride. Uber spends over $6 million annually in the U.S. alone on these lobbying efforts.

26.     For Uber, sexual assault and harassment in its vehicles is the price of doing business. This philosophy has been its consistent view since at least 2014, and it continues to be its view today. When women are assaulted on its platform, Uber does not take responsibility but instead blames the passengers themselves.

27.     This litigation aims to require a different way of doing business—to force Uber to live up to its promise and undertaking of providing safe transportation for Drivers. The Plaintiff, like other women drivers, was sexually assaulted or harassed by an Uber rider in connection with an Uber ride. The Plaintiff seeks compensation, punitive damages, and appropriate injunctive relief to ensure sexual assault in Uber vehicles is foreclosed to the greatest extent possible.

---

[6] https://www.uber.com/us/en/drive/safety/

## II.  PARTIES

### A.  Plaintiff

28. Plaintiff, Shawna Scyoc, is an Individual who resides in Nashville, TN. The Plaintiff was 40 years old at the time of the sexual assault by an Uber Rider in this matter.

### B.  Defendants

29. Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business at 1725 3rd Street, San Francisco, California, 94158. Defendant Uber Technologies, Inc. can be served with process through its Registered Agent: CT Corporation System, 3300 N. Brand Blvd., Suite 700, Glendale, CA 91023

30. Defendant Rasier, LLC is a Delaware limited liability company. On information and belief, Rasier is a wholly owned subsidiary of Uber Technologies, Inc. Rasier maintains its principal place of business at 1515 3rd St., San Francisco, California, 94158. On information and belief, Rasier, LLC is entirely controlled by Uber Technologies, Inc. Defendant Rasier, LLC. can be served with process through its Registered Agent: CT Corporation System, , 3300 N. Brand Blvd., Suite 700, Glendale, CA 91023

31. Defendant Rasier-CA, LLC is a Delaware limited liability company. On information and belief, Rasier-CA is a wholly owned subsidiary of Uber Technologies, Inc. Rasier-CA maintains its principal place of business at 1515 3rd St., San Francisco, California, 94158. Rasier-CA is the one of the primary Uber entities that has interfaced with the California Public Utilities Commission, and so its activities affect Uber passengers in all states. On information and belief, Rasier-CA is entirely controlled by Uber Technologies, Inc. Defendant Rasier-CA, LLC can be served with process through its Registered Agent: CT Corporation System, 3300 N. Brand Blvd., Suite 700, Glendale, CA 91023

32. Defendants Uber Technologies, Rasier, and Rasier-CA are collectively referred to as "Uber."

## III.  JURISDICTION AND VENUE

33. The subject matter in controversy is within the jurisdictional limits of this court.

34. This Court has jurisdiction over the parties under 28 U.S.C. § 1332(d) because the Plaintiff is a citizen of the State of Tennessee Defendants are citizens of California and Delaware

35. Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to those Plaintiff's claims occurred in this district.

36. This Court has personal jurisdiction over Defendants because their significant contacts related to this litigation in Tennessee makes personal jurisdiction proper over any of them.

## IV. FACTUAL ALLEGATIONS

37. The Plaintiff asserts that each fact stated in this Complaint was and is true at all relevant times, past and present, unless otherwise specified.

38. In the early morning hours of September 8, 2024, the Plaintiff was sexual assaulted by an Uber Rider who groped the Plaintiff's breast, other sexual body parts, forcibly penetrated the Plaintiff's vagina with his hand, forcibly kissed the Plaintiff, forcibly placed the Plaintiff's hands down his pants to make contact with his penis, at which time the Uber Rider caused semen to get on the Plaintiff's hand.

39. The above sexual assault facts were reported to the Police. The Police Report indicates that on September 8, 2024, the Plaintiff was able to flag down a police officer at 1221 W. Main Street in Hendersonville, TN at 3:40AM. The Plaintiff reported to the police officer that a 5'5" or 5'6" Uber Rider of Latino origin requested a trip through the Uber App from a trailer park on Williamson Road in Millersville, TN to a trailer park on Iris Drive in Hendersonville, TN.

40. The Plaintiff reported that the Uber Rider sat in the front seat of the Plaintiff's vehicle, smelled of alcohol, and claimed to be leaving a baby shower at his sister's home in Hendersonville, TN. The Plaintiff did not report the name of the Uber Rider, but did give the officer a physical description of the male Uber Rider and a probable location of the Uber Rider's trailer at the trailer park in Millersville, TN.

41. The Plaintiff reported having to clean semen off her hands with sanitizer wipes and that the Uber Rider left $40.00 in the cup-holder for "the sex." The police officer took the

wipes with seminal fluid on them and the $40.00 left by the Uber Rider as evidence. The police officer also took pictures of fingerprints left by the Uber Rider in the Plaintiff's vehicle.

42.     The Plaintiff received scant information from Uber about the Rider before the trip and received no information from Uber about the risk profile of the Rider.

43.     The Plaintiff has never been told by Uber about increased risk of accepting a male passenger from Uber late at night.

44.     The Plaintiff has never been told by Uber that male passengers who have been drinking are an increased risk to the Plaintiff's safety.

45.     The Plaintiff has never been told by Uber that a high percentage of those sexually assaulted on the Uber Platform are Uber Drivers.

46.     The Plaintiff has never been told by Uber that a male passenger should not be allowed to sit in the front seat on an Uber Trip.

47.     At the time of the sexual assault of the Plaintiff, Uber's system was notified through telematics that the trip experienced irregularities. Uber's system collected information before, during, and after the Uber trip that would have notified Uber that the trip did not occur as it should have.

48.     Uber's processes require a JIRA investigation to be performed and a JIRA Investigation Form to be completed when Uber receives a report of a sexual assault on the system. The JIRA Investigation Form identifies evidence of the reported sexual assault, identifies Uber Customer Service Representatives that perform the investigation, proposes an adjudication of whether an Uber User should be removed from the platform, and contains a final adjudication of whether to remove an Uber User from the system that is signed off by an Uber Manger.

49.     Uber maintains thousands of policies in its Knowledge Base System that control Drivers through directing Customer Support Staff on how to deploy Uber's systems. These Knowledge Base Policies inform Customer Support Staff on how to manage Uber Drivers concerning any report, complaint, or issue that a Driver may have. These policies additionally, direct Customer Support Staff on when to take negative employment action against a Driver,

when to apply a notation or strike against an Uber Driver, and when to waitlist (suspend) or deactivate (permanently terminate) an Uber Driver.

50.     Uber's system also maintains vast information about the Uber Rider that is never shared with the Plaintiff. Uber's system assesses risk of every trip and does not notify the Uber Driver of these known risks when sending the trip to the Uber Driver. This safety platform is known as Safety Lens and is an internal customer relations management tool with landing pages for each Uber User (Rider or Driver). Safety Lens maintains a safety profile and risk assessment of a User. Uber does not disclose this information to Uber Drivers to inform the Uber Driver of the risk associated to an Uber Rider.

51.     Uber monitors a driver and rider's position automatically through systems known as Chronicle and Voyager.  These systems track GPS, speed, breaking, phone handling, and use telematics to monitor an Uber Driver and an Uber Rider. Uber does not inform Uber Drivers that they are being monitored automatically by these systems and does not relay information tracked by these systems to Uber Drivers.

52.     On information and belief, Uber had actual notice that the Uber Rider had broken its internal rules and policies. Additionally, Uber was on notice that Uber's pairing of the Rider and the Plaintiff was a high-risk pairing with an exponentially higher risk of a serious interpersonal conflict to the Plaintiff.

### A.     The Uber Transportation System

53.     Uber is a transportation company headquartered in San Francisco, California that pioneered an app-based transportation system that eventually spread through the United States and around the world.

54.     Uber provides an online and mobile application—the "Uber App." The Uber App connects people seeking transportation with Uber Drivers who use their personal vehicles to provide transportation in exchange for compensation. Users request and pay for rides through the customer version of the Uber App. Uber Drivers are notified of requested rides, which they can then accept and be compensated for by Uber through the driver version of the Uber App. Both versions of the app connect to the same website, Uber.com, which is Uber's website.

55. Anyone from the public may download either version of the Uber App for free.

        **1.**     **Uber maintains complete control over its transportation system, including the Uber App, and so has the ability and responsibility to prevent sexual misconduct facilitated by that system.**

56. Uber is the designer and operator of its transportation system, and the designer, manufacturer, operator, and seller of the Uber App that supports that system.

57. Uber alone decides who can access the Uber App.

58. On the passenger end, Uber decides who will be approved, and on what terms, to be an Uber account holder and thus be able to use the Uber App. This includes promulgating and enforcing rules regarding age restrictions, number of accounts per person, assignability and transferability of the account, and the ultimate right to approve, delete, or deactivate accounts.

59. On the driver end, Uber alone decides which drivers it will recruit, who will receive access to its transportation platform, and on what terms. It chooses whether and how to screen those drivers. It alone decides what background checks to use, how far back to look, what prior offenses will be disqualifying, whether and how to onboard drivers in the absence of meaningful background checks (e.g., when a driver has recently moved to the jurisdiction where the background check is conducted), whether to conduct in-person interviews, whether to conduct in-person trainings or orientations, whether to have any in-person interactions with drivers, whether to conduct drug alcohol screenings, and whether to require training or have drivers take exams.

60. Uber passengers and Uber drivers are subject to Uber's policies and procedures, of which Uber has ultimate authority to enforce.

61. Uber designs the way in which the entire transportation experience will work.

62. Uber selects which driver will be matched with which rider, and the basis on which that match will occur.

63. Uber designs the ride pick-up experience. It sets the pick-up and drop-off location. It decides what trade dress, markings, decals, devices, and in-App tools will be used for the driver and rider to recognize one another.

64.     Uber decides which aspects of a driver and rider's transportation experience (including but not limited to requesting a ride, requesting a ride for someone else, accepting a ride, locating a rider, locating a driver, getting into a driver's vehicle, driving to a destination, making stops, changing destinations, adding multiple destinations, arriving at a destination, and disembarking) will be supported by buttons, controls, information, and other tools within the Uber App, or by technology, devices, and services external to the Uber App.

65.     When users arrange transportation with the Uber App, they input their destination and request a driver. The Uber App then uses an algorithm to match the user with a nearby driver. Uber drivers must be logged onto the Uber App and indicate their ability to provide rides to be matched with a rider.

66.     Uber has complete control over the amount of the fare, including additional fees and when to implement dynamic pricing.

67.     Likewise, Uber controls all promotional offers, vouchers, and discounts (e.g. Uber Cash) and how they can be applied to a particular fare.

68.     If a rider chooses to cancel a trip, it must be canceled through the Uber App and Uber will determine if a cancellation fee will be charged and in what amount.

69.     If a rider chooses to modify a trip, such as adding additional stops, it must be modified through the Uber App and Uber will determine if additional fees will be charged and in what amount.

70.     Uber collects GPS data and information on its drivers whenever they are using the Uber App, and on riders from at least the time they request a ride until five minutes after they are dropped off.

71.     Uber decides what information will be provided to the passenger about the Uber driver and vice versa. In doing so, Uber has decided that limited information should be provided. Passengers receive only a photo of the Uber driver, along with the driver's first name, vehicle type and license plate number.

72.     Uber does not provide drivers and riders with one another's contact information. Instead, all communications must be made through, or to, Uber. Uber decides what

communications can be sent and when. After a ride, for example, a rider cannot request a refund directly from a driver, but only from Uber.

73.    Uber handles and decides the outcome of all complaints, issues, and grievances regarding the Uber ride.

74.    When an Uber driver or rider sends a support message through the Uber App, or calls Uber with a concern or complaint, Uber responds using automated software programming and, where necessary, deploying a global customer support staff that follows Uber's protocols to address the concern or complaint. Uber facilitates, controls, tracks, and records these interactions via its internal customer service software.

75.    Neither drivers nor riders have access to the information in Uber's internal customer service relations platform. Uber has the ability to track and investigate driver and rider misconduct that occurs when drivers and riders use Uber's transportation services, and over time it has increased its actual tracking of driver misconduct.

76.    A driver has no knowledge of an Uber rider's prior bad actions, including whether the Uber rider had prior complaints, is or was under investigation for misconduct, or had been subject to any suspension or other disciplinary action from the Uber system. A driver further has no control over which Uber rider they will be paired with on any ride. Uber alone controls the pairing and controls access to all information between the rider and the driver.

### 2.    Uber controls its drivers and their work.

77.    Uber exercises extensive control and direction over its drivers in connection with the performance of the work that Uber hires the drivers to perform.

78.    Uber is a transportation company that provides transportation as its core business. Uber drivers' work is thus squarely within and integral to the usual course of Uber's business, as Uber cannot provide transportation services without drivers.

79.    Driving for Uber is not a specialized skill. Uber drivers are largely nonprofessional, untrained individuals, who have no specialized background, education, training, or experience related to their work for Uber. Uber drivers are not customarily engaged in an independently established trade, occupation, or business.

80.     No preparation or up-front investment is required to work for Uber. Any person with a vehicle and driver's license can decide to drive for Uber, and apply to do so within the very same hour.

81.     Uber's investments into its transportation company greatly outweigh the investments by the Uber driver. Uber has invested hundreds of millions of dollars into its transportation network and transportation systems. Additionally, Uber maintains brick and mortar facilities around the world where it employs thousands of individuals to interact with Uber drivers and riders.

82.     No specialized tools or equipment are required to drive for Uber. Rather, Uber drivers need only have a personal vehicle that is subject to approval by Uber. For example, Uber currently requires, among other things, that Uber vehicles have four doors, be in good condition with no cosmetic damage, and be free of any commercial branding.[7]

83.     Uber provides its approved Uber drivers with access to Uber-branded decals and signage for use in their vehicles while they maintain active Uber accounts.[8]

84.     Uber requires drivers to comply with a list of "Community Guidelines" that Uber promulgates. The term is itself misleading because it makes it sound like driving for Uber is like visiting a fitness center or the library. In reality, Uber drivers operate in an environment and under such restrictions (or lack thereof) as Uber unilaterally decides. Violation of any of the "Guidelines" is grounds for termination.

85.     Uber drivers must use the Uber App to access, accept, and complete Uber rides.

86.     Uber sets the minimum amount of work that an Uber driver must complete. For example, Uber requires that an Uber driver complete at least one trip each month; otherwise, Uber will deactivate their account.

---

[7] Uber Help, Driving & Delivering, Vehicle Requirements, https://help.uber.com/driving-and-delivering/article/vehicle-requirements?nodeId=2ddf30ca-64bd-4143-9ef2-e3bc6b929948
[8] Uber Help, Driving & Delivering, Uber Decal Requirements, https://help.uber.com/driving-and-delivering/article/uber-decal-requirements/?nodeId=421b14ed-0685-4188-9fa3-f2104e881c3f

87.     Uber monitors how long an Uber driver has been driving and disables the driver's App for six hours after driving time reaches 12 hours.[9]

88.     Uber retains the ability to deactivate a driver's App without notice or investigation.

89.     Uber has exclusive access to the customer list (riders), customer locations, and the customer's destination requests.

90.     Uber designates the approved geographical region for the Uber driver. If the Uber driver wants to receive rides outside of that area, they must submit a request to Uber.

91.     When Uber offers a trip to an Uber driver, its practice has been to withhold information from Uber drivers such as the rider's destination address, gross fares, net fares to the driver, per mile rate, and per minute rate. By withholding this information, Uber requires Uber drivers to blindly accept the trip without knowing the final destination or the amount that the driver will earn.

92.     Uber assigns all drivers' work through its driver/rider matching algorithm. The Uber driver cannot choose which rider to be matched with, nor can riders choose their drivers.

93.     Uber has exclusive control of the customer volume. Uber decides who, when, where, and how many ride requests to assign to each driver.

94.     The Uber driver has zero control over the value of the services provided. Uber unilaterally sets the base fare, time fare, distance fare, wait-time fare, and all surge fares (algorithmic increases in fares to reflect supply of drivers and demand of riders).

95.     Uber dictates what forms of payment are accepted and forbids Uber drivers from requesting or accepting cash for fares.

96.     Uber forbids drivers from negotiating a different fare with riders for any trip on its system.

---

[9] Uber Newsroom, *Another Step to Prevent Drowsy Driving*, https://www.uber.com/newsroom/drowsydriving?utm_term=wH-UFOSSU0N-QETxEITLuSw1UkjxB0QVMRbX0M0&adg_id=218769&cid=10078&utm_campaign=affiliate-ir-Skimbit%20Ltd._1_-99_national_D_all_ACQ_cpa_en&utm_content=&utm_source=affiliate-ir

97.     Uber tracks Uber driver locations and suggests certain routes for trips. Uber has the right to adjust a fare if a driver takes a different route.

98.     Uber alone decides what percentage of each fare to keep and what percentage to pay to the driver or, in some cases, whether to share certain fares with the driver at all. Uber does not inform drivers how much the rider is paying.

99.     Uber processes all payments and distribution of payments to the driver.

100.    To begin work, a driver logs into the Uber App and then waits for Uber to select a customer. Uber refers to this time that a driver is activated but un-dispatched as "Period 1" time (or "P1").

101.    Uber uses real-time GPS monitoring to track the driver at all times while logged into the app, beginning with P1 time.

102.    During P1, Uber unilaterally decides when and where to send the driver trip assignments for customers requesting rides.

103.    Once Uber gives a driver a trip assignment, Uber allows the driver only 15 seconds during which to "accept" the assignment. However, the appearance of a "decision" by the Uber driver as to whether to "accept" a ride is only superficial. Uber controls the information provided to the Uber driver during the 15 seconds, and it generally does not provide the driver the estimated fare, estimated distance, rider's pickup location, or final destination (despite possessing all of the information) to allow the driver to make an economic assessment.

104.    Uber monitors the driver's use of the Uber App, and the rate of accepted, declined, and cancelled assignments, which Uber can use to deactivate or suspend the driver.

105.    Once a driver accepts a trip assignment, the driver enters what Uber refers to as "Period 2" time ("P2"). This is the period in which the driver is dispatched but has not picked up the rider.

106.    During P2, Uber provides a driver with the rider's pickup location, but it still does not provide the driver with the estimated fare, trip time, distance, or destination.

107.    Upon arriving at a rider's location, the driver remains in P2 until the rider physically enters the vehicle. Once the rider enters, the driver must inform the Uber App to begin

the trip. The time during which the driver is transporting the rider to her destination is referred to as "Period 3" ("P3").

108.    During P3, Uber uses its technology to monitor the driver's speed and location; whether the driver is arriving within Uber's estimated time of arrival; whether the driver is taking the rider "off route;" and whether the driver is operating his vehicle in a way Uber deems acceptable. Uber can, and at least sometimes does, monitor audio within a vehicle, but does not make the audio recording available to drivers or riders, and instead uses the audio when doing so would protect Uber's interests.

109.    Additionally, Uber uses its technology and GPS data to monitor the speed, braking, and other driving maneuvers. Uber's system monitors this data for every trip.

110.    Uber advertises that, during P3, it offers a service called RideCheck. In Uber's words, "Using sensors and GPS data, this feature can help detect if a trip doesn't go as planned. We'll check in to make sure the driver and rider are safe and provide easy access to emergency assistance features for immediate help if needed."

111.    Uber advertises: "If an incident occurs, in-app support is available around the clock. Our specialized team of safety agents are trained to handle sensitive reports and can offer support resources."

112.    If an Uber driver deviates from Uber's suggested route, Uber notifies the driver that they are not following the suggested route.

113.    Uber controls the driver's actions by threatening to deactivate or suspend drivers if they do not maintain a certain star rating. Uber unilaterally sets the star rating and constantly prompts Uber drivers to keep a high star rating or to improve the star rating if the driver is not performing to Uber's standards.

114.    Uber unilaterally sets the percentage of trips a driver can cancel. A "cancelation" occurs if the driver accepts the trip and then cancels the trip before the rider enters the vehicle. Despite the driver not having key information prior to accepting the trip Uber offers, Uber can deactivate a driver if the driver cancels too many trips.

115.     If a driver engages in misconduct or alleged misconduct that Uber considers to be a "strike," Uber can and will issue a "strike" or an "notation". In Uber's discretion, a certain number of strikes or notations can result in the driver being permanently removed from the Uber App. However, Uber does not inform drivers or riders whether a driver was previously issued a strike or how close to termination a Driver is based on the number of strikes or account notations.

116.     In addition, Uber engages in personnel management typical of an employer-employee relationship, including: facilitating "meaningful dialogue" with drivers; "hold[ing] regular meetings with Driver associations and conduct[ing] regular surveys to gather feedback on our app, our support services, and other matters"; "continually developing new technology that Drivers can use to acquire information that may help them save on costs and make informed choices about where and when to drive (based on when and where their earnings potential is highest)[;]" and "partner[ing] with learning and academic institutions to provide opportunities to eligible Drivers and their family members through undergraduate degree programs and courses on entrepreneurship, skills development and language learning."[10]

**B.     An elevated risk of sexual assault was always a foreseeable consequence of Uber's transportation model, and Uber always had a duty to address and prevent this harm.**

117.     Reasonably careful and responsible businesses adopt a "think before you act" way of doing business. They do not just think about how to make money, but also about the effects their actions will have on others, including on public safety. They think about whether their business will put people at risk, including the risk of crime, and they think about how to reduce any such risk.

118.     Transportation companies have a particular duty to keep passengers safe. By offering transportation services, such companies assert that they can be trusted to safely transport someone from one place to another. Individuals who get in a plane, train, taxi, or Uber, are trusting that the transportation company will keep them safe.

---

[10] Uber 2022 Annual Report, Form 10-K, at p. 9-10, https://s23.q4cdn.com/407969754/files/doc_financials/2023/ar/2022-annual-report.pdf

119. More so than other businesses, transportation companies have to think about and address the ways that platform users, including Uber Drivers, could be harmed, including the risk of crime in connection with the pick-up, transport, or drop-off process.

120. The more innovative a business, the more important it is for the business to think about the potential that it might introduce new but foreseeable risks to public safety.

121. Uber is an extraordinarily innovative transportation company. Its business model disrupted and transformed the entire transportation industry.

122. When Uber introduced so-called "peer-to-peer" transportation in 2013, this innovation foreseeably brought an elevated risk of sexual assault. Uber's transportation model involved aggressively bringing in millions of users to its platform but withheld safety information from Drivers, including the substantial risk to sexual assault, physical assault, car jackings, driver murders, and other crimes.

123. Uber then convinced drivers to trust that Uber's business model was safe, that the dangers were thoroughly vetted, and that drivers could securely entrust their safety with Uber, who, in turn, would have the power to earn on the Uber platform.

124. The foreseeable use environments for Uber's transportation system include: drunk riders, to whom Uber specifically advertises its service who Uber knows to be a danger to an Uber Driver but does not warn drivers of these dangers.

125. An elevated risk of sexual assault was always a foreseeable consequence of Uber's business model, and Uber knew or should have known this.

126. Reasonably careful and responsible businesses, when they innovate in ways that foreseeably introduce new or heightened public safety risks, think about and address those risks in an evidence-based way, including by hiring the right experts, and devoting adequate money and other resources to study those risks and prevent harm. Uber took none of these measures.

**C.** **From the outset, Uber did not address or prevent sexual assault.**

127. From its founding, Uber's culture had little regard for legal compliance or responsibility.

128.     This attitude informed how Uber approached sexual assault. Uber did not think about, talk about, or study the risk of sexual assault on its platform. It did not conduct studies, focus groups, or user testing for the purpose of preventing sexual assault.

129.     Uber did not devote money or resources to preventing sexual assault on its platform.

130.     Uber did not assign accountability to any employee for the issues of safety, identifying or addressing potential risks to Uber's drivers, or preventing sexual assault. Uber asserted that safety was everybody's job as a way of disguising that it was nobody's job. Uber did not hire safety engineers, certified safety professionals, or any other personnel with expertise in safety, crime prevention, or sexual assault prevention.

131.     Uber did not build the Uber App, nor design its transportation system, nor adopt measures or policies, in a way aimed at preventing sexual assault.

132.     In 2017 and 2018, when Uber finally began appointing employees to positions ostensibly focused on sexual violence prevention, it did not require expertise or background in safety fields. Personnel at Uber whose job titles involved safety were tasked with protecting Uber's reputation rather than ensuring the safety of its riders.

133.     Uber could have dramatically and effectively reduced—if not eliminated—sexual assault on its platform if it had designed its transportation system with that goal in mind. When companies that operate daycare centers, schools, and business offices engage in evidence-based research on situational sexual violence prevention, they are usually able to dramatically and successfully reduce or eliminate these crimes.

134.     Uber had many tools at its disposal for reducing drivers' vulnerability to sexual assault, including but not limited to: rigorous screening of riders; prompt removal of riders who engage in sexual misconduct; in-App tools such as panic buttons with prompt responses from Uber and coordination with law enforcement; surveillance for unusual conduct (such as lengthy stops) during rides; informing riders and communicating to them that there will be strict penalties and accountability; diligently investigating allegations of sexual assault; communicating to drivers that Uber is unsafe, particularly with intoxicated riders or late at night; immediate

removal of riders who violate policies, mandatory installation of cameras that inform riders that Uber is watching, and so forth.

135.    More generally, Uber had no interest in slowing its growth in order to study safety. Consequently, it did not take sufficient action to study or prevent sexual assault. The safety-related studies the company did conduct were ignored, asked the wrong questions, or were designed in a way to lead to pre-determined conclusions (such as cameras not preventing sexual assault).

136.    It is well established that sexual assault is preventable through environmental modifications that deter sexual violence. If Uber had been reasonably thoughtful and careful in the rollout of its transportation product, it could have prevented the sexual misconduct that harmed the Plaintiff.

**D.    Uber deceptively convinced the public and Drivers like the Plaintiff to trust Uber to offer safe rides.**

137.    In order to disrupt the public's cautious attitude on the topic of pairing strangers on a transportation system, Uber spent many millions of dollars marketing and promoting the concept that its UberX platform was safe for Drivers.

138.    Uber saturated the public with safety marketing directed to every single Uber customer as well as the general public. Uber promoted its safety message through advertising in bars, stores, and other business establishments and public places, and as well as placing ads online in search engines, social media, and direct email and app-based communications to Uber customers.

139.    Safety remains today part of the essential value proposition of the Uber product. This is so because of Uber's representations. It is also the case because of the inherent nature of the product. To some extent, all providers of public transportation are implicitly agreeing to provide safe transit to its users.

140.    As a result, every driver can be presumed to have relied on Uber's representations of safety and its concealment of a lack of safety for those using its transportation system.

141.    Uber owns several trademark registrations for "UBER" and several Uber-based marks. It has used Uber as a trademark and trade name in connection with goods and services since 2010. In opposing applications submitted by others to the United States Patent and Trademark Office that contain some form of the word "Uber", Uber has stated that through its "marketing, promotion, advertising, and commercial activity, the public readily associates the UBER Marks and Names with Uber and its goods and services. The UBER Marks and Names are thus valuable assets of Uber and symbols of its goodwill." Uber has argued that "Even more, the fame and reputation of Uber is of such a nature that a connection with Uber would be presumed when [an unaffiliated person or company] uses [a trademark containing the word uber] in connection with its services." Uber has further argued that "[a trademark containing the word 'uber'] uniquely and unmistakably points to Uber's famous name and identity." Trademarks and service marks are recognized to function both as an indication of origin or ownership and to serve as a guarantee of constancy of the quality or other characteristics of a product or service.

142.    Uber knows that its drivers recognize, are familiar with, and trust its famous transportation brand, and that they do not recognize, know, or automatically trust Uber riders. To induce drivers to work, Uber knows that it must cultivate a reputation for safety and transfer that reputation to the Uber platform.

143.    Because of Uber's representations, Uber's drivers believe that working for Uber is safe. Uber advertises and markets its brand and safety record in a manner designed to cause the public to believe these things. And it knows that the public believes these things and relies on these beliefs.

144.    Uber has never presented itself to the public as a mere technology company or broker of transportation services. It has always advertised itself as a transportation company that provides reliable and safe rides. For example, in 2011-2013, its website and ubiquitous advertising called Uber "Everyone's Private Driver." In 2015, its website said Uber provided rides on demand and in 2016 it said "Uber is the smartest way to get around."

145.    At all times, Uber has communicated with drivers using language such as "Sign up to drive" as opposed to "sign up to offer your driving services via our app."

146.    Uber held out its transportation as available to any member of the public. For years, it advertised: "Open to everyone, everywhere. All ride requests are blindly matched with the closest available driver. So there is no discrimination based on race, gender, or destination."

147.    Uber built its brand and business by aggressively marketing safety.

148.    In 2014, Uber started charging passengers an extra $1 fee for each trip. Uber called this a "Safe Rides Fee." When Uber announced the "Safe Rides Fee," it told public and Uber Drivers that the "[f]ee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."[11]

149.    Uber collected the "Safe Rides Fee" on hundreds of millions of rides and made hundreds of millions in revenue as a result."[12] But it never earmarked the money for improving safety or for the safety-related items it promised.[13] The actual purpose of the "Safe Rides Fee" was to "add $1 of pure margin to each trip."[14] As one former Uber employee said, "[w]e boosted our margins saying our rides were safer. … It "was obscene."[15]

150.    Uber has actively marketed and successfully cultivated an image among its customers of safety and superiority to public transportation and traditional taxis – which is reflected in its very name.[16]

151.    Uber knew this marketing was false. In 2016, Uber agreed to pay $28.5 million to settle a class action lawsuit over its fraudulent marketing of its security screening as "industry-leading." In 2016, Uber also agreed to pay $25 million to settle a consumer protection action filed by the County of Los Angeles and City of San Francisco, and it agreed as part of the

---

[11] Uber Support, What is the Safe Rides Fee, https://web.archive.org/web/20140420053019/http://support.uber.com/hc/en-us/articles/201950566
[12] Isaac, *Super Pumped*, at 135-36.
[13] *Id*.
[14] *Id*.
[15] *Id*.
[16] Dictionary.com defines "uber" as "designating a person or thing that exceeds the norms or limits of its kind or class."

settlement to stop using phrases such as "safest ride on the road" and describing its background checks as "gold standard."

152.    When Uber announced the 2016 settlements, it did not correct its misstatements or tell the truth about its standards or safety record. Instead, it explained its advertising changes as follows: "[N]o means of transportation can ever be 100 percent safe. Accidents and incidents do happen. That's why we need to ensure that the language used to describe safety at Uber is clear and precise."[17]

Uber's fraudulent safety advertising caused it to gain a large customer base. Even after the 2016 settlements, Uber kept the benefit of its fraud. Uber kept pointing to its fraudulently-gained large customer base as evidence of its purported trustworthiness, and as a reason for more Uber Drivers to trust it.

153.    In 2017, following its fraud settlements, Uber subtly changed its advertising to be slightly more vague, but still misleading. It advertised: "From start to finish, a ride you can trust" and "[S]afe rides for everyone: Whether riding in the backseat or driving up front, every part of the Uber experience is designed around your safety and security." It further proclaimed: "Uber is dedicated to keeping people safe on the road."

154.    In 2019, Uber continued advertising, "Your safety is always a top priority. We're committed to helping drivers and riders get where they want to go with confidence." It also advertised that it was "Building safer journeys for everyone." Uber CEO Dara Khosrowshahi said "Helping keep people safe is a huge responsibility and one we do not take lightly."

155.    From 2021 through the present, Uber has continued prominently advertising "Our commitment to your safety," and told the public it was "Focused on safety, wherever you go." It also said "we're committed to helping to create a safe environment for our users."

156.    To this day, Uber's website describes how Uber is "Designing a safer ride" and that it offers "features to help keep you safe."

157.    To this day, Uber falsely maintains that safety is its top priority.

---

[17] Uber, Settlement with District Attorneys of San Francisco and Los Angeles, published April 7, 2016 (still online as of February 3, 2024) https://www.uber.com/blog/da-settlement/

158.     Because of Uber's aggressive marketing, most Uber drivers are generally unaware

of the real risks associated with Uber rides and continue to think of Uber as a well-known,

widely trusted transportation company that stands behind the safety of the rides it offers. Most

Uber customers are not aware of all the limitations of Uber's safety measures and oversight of

dangerous riders. Nor are they aware that Uber refuses to take any responsibility for rider

misconduct.

### 1.     <u>Women Preferred Riders was one way that Uber could have protected Female Drivers on its platform.</u>

159.     Uber has been aware for years that women Uber Drivers are vulnerable to sexual

assault and physical violence on its system by male passengers. Uber has known that one way in

which it can reduce violence against women Uber Drivers by male Uber riders is to offer women

preferred passengers and other preferences that women can set to reduce violence caused by men

on the Uber platform.

160.     On July 23, 2025, Uber began advertising Women Preferences on its system and

an option for female drivers to set preferences to accept only female passengers.[18]

161.     Uber has known at least since 2019 that a Women Preferred Rider option reduces

sexual assault towards female Uber Drivers, but refused to deploy these options in the United

States until July of 2025:



---

[18] https://www.uber.com/newsroom/women-preferences/

*See* https://www.uber.com/newsroom/women-preferences/, July 23, 2025 Uber Newsroom Article marketing Women Preferred Rider option to Drivers.

162.   In its July 23, 2025 Uber Newsroom Article, Uber boasts that "Women drivers will soon have the option to request trips with women riders, including during peak earning hours like evenings. This means more opportunities to earn on their terms with flexibility and confidence."[19] Additionally this article informs female Uber Drivers that, "Women drivers can simply toggle on the "Women Rider Preference" in their app settings. If they want to receive trip requests from all riders, they can turn the preference off at any time."[20]

163.   However, Uber has known for a decade that female Uber Drivers are safer when they have the option to be paired only with female riders. Uber also promulgated video campaigns specifically aimed at reassuring women its platform is designed for them and safe for them. For example, in 2015, it ran an ad campaign called "Driven Women" featuring "the stories of the women who ride and drive with Uber in the Pacific Northwest region of the United States."[21]

164.   To this day, Uber has an entire webpage devoted to "Driving women's safety forward."[22] The page describes "safety features built into every ride." It advertises, "We're dedicated to building a platform where women feel safe." Until recently this page also advertised, "Uber is committed to help stop incidents before they happen."

165.   Through such representations, Uber successfully induces women to trust Uber as a safe transportation provider and, on that basis, to get into private vehicles with Uber drivers.

**2.   Even though Uber knows intoxicated Uber riders have a high risk of committing sexual assault to drivers, it does not inform Uber Drivers of this risk.**

166.   By 2013, when Uber started a new transportation system, it either understood or should have understood the concept of situational vulnerability and the risk an intoxicated rider has towards an Uber Driver. It knew or should have known that its new transportation system

---

[19] *Id.*
[20] *Id.*
[21] https://www.youtube.com/watch?v=Ite9YjpLI7I
[22] https://www.uber.com/us/en/safety/womens-safety/

gave rise to a heightened risk of sexual assault, and that this situational vulnerability would be at its highest for women drivers when transporting intoxicated riders.

167. Since 2013, Uber observed that a big segment of its potential market consisted of intoxicated individuals and that it could increase its profitability by targeting these potential customers.

168. Despite the known heightened risk to female Uber drivers by intoxicated riders, over the years, Uber has launched numerous marketing campaigns specifically promoting its product to, among others, people, including intoxicated male riders.

169. As a result of Uber's marketing to intoxicated individuals, Uber invited dangerous individuals to ride on its system. Additionally, Uber's policies against Driver Trip Cancellations, induces Uber Driver to accept trips from potential dangerous Uber Riders. Uber publicly claims that an Uber Driver hast the freedom to cancel any trip if the Driver feels they are in an unsafe situation with a Rider, however Uber maintains cancellation rates for drivers and will deactivate an Uber Driver if they cancel too many trips. These cancellation rates are used by Uber to force drivers to accept trips offered, even if the passenger is intoxicated or at a higher safety risk to the Driver.

E. **Uber tried not to learn about sexual misconduct on its platform.**

170. Sexual assault is an underreported crime, for a variety of reasons. It is often difficult for survivors to come forward and tell their stories. Many survivors struggle with trauma and find it inherently painful to "relive" the incident by talking about it. Many survivors worry that they would be interrogated, or subjected to other painful treatment if they came forward. Many survivors worry that they would be disbelieved if they came forward. Often sexual assault is unwitnessed and the survivor has to carry the weight of knowing that the outcome depends entirely on the survivor's testimony. Survivors may also struggle with feelings of guilt, confusion, doubt, and self-blame.

171. Thus, the reports of sexual misconduct by Uber Drivers to Uber represent only a small fraction of the actual sexual misconduct that drivers experience during Uber rides.

172.    Uber, if it wanted to learn about sexual misconduct occurring on its platform, would have encouraged reporting, including building clear methods for survivors to report sexual assault, reassuring them that they will be treated with respect and protected against retaliation, and offering supportive interactions from trauma-informed individuals.

173.    Instead, Uber focused on making money, not on the safety of its riders. Therefore, it was not a priority for Uber to learn about sexual misconduct occurring within its transportation system.

174.    Instead, Uber prioritized its *reputation* for safety— which was based on a lie— and maintaining its "critical mass" of Uber drivers and consumers.[23] On reputation, Uber knows that acknowledging and publicizing reports of sexual assaults on its platform would be bad for its reputation. According to Uber, "[p]ublic reporting or disclosure of reported safety information, including information about safety incidents reportedly occurring on or related to our platform, whether generated by us or third parties such as media or regulators, may adversely impact our business and financial results."[24]

175.    Therefore, Uber did not encourage—and in fact discouraged—sexual assault reporting. Uber wanted to keep sexual assault on its platform hidden, and it acted accordingly. Simply put, it was not in Uber's interest to even *acknowledge* the incidents of sexual assaults. In order to preserve its brand reputation and massive growth, Uber intentionally turned a blind eye to what was a glaring defect in its global enterprise.

176.    Uber thus fostered a system in which complaints were not encouraged (either directly through the manner in which complaints were processed, or indirectly through the provision of subpar reporting tools); proper investigations not conducted; categorization of the

---

[23] Uber 2019 Form S-1 at 29, https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm; *see also* Uber, 2022 Annual report, Form 10-K, at 17, https://s23.q4cdn.com/407969754/files/doc_financials/2023/ar/2022-annual-report.pdf
[24] Uber, 2022 Annual Report, Form 10-K at 18, https://s23.q4cdn.com/407969754/files/doc_financials/2023/ar/2022-annual-report.pdf; Uber, 2019 S-1 at 33, https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm.

type and nature of assaults mismanaged; and, safety tools and mechanisms during a ride not initiated.

177.     Uber did not build straightforward or simple ways for drivers to report sexual misconduct that occurred during a ride. Instead, the features were intentionally obscured in the Uber App, making it difficult and confusing for drivers to report sexual assault.

178.     Further, Uber did not provide any mechanism, or even assurances, of protection for Drivers who did make a report.

179.     Even when Uber Drivers report sexual misconduct, Uber does not devote sufficient resources to reasonably investigate such reports.

180.     Until at least 2018, Uber assigned the job of investigating serious safety incidents, including sexual misconduct, to a small, insufficient number of employees. Until at least 2018, these employees were overworked, and had too little time to investigate such reports.

181.     Until 2018, Uber had no formal taxonomy for tracking sexual misconduct on its platform and did not standardize how to classify sexual misconduct. To this day, Uber investigators mislabel sexual assault of an Uber Driver as flirtation, inappropriate comments, or inappropriate communications.

182.     Uber's deficient categorizations of sexual misconduct and sexual assault limited its ability to learn about, study, and prevent sexual misconduct directed at its Drivers.

183.     In 2021, the New York Times reported that Uber's team of purported "investigators" typically had "little to no background in trauma response… They are given scripts to read to often-upset passengers and drivers, and strict company policies prohibit the agents from reporting the incidents to the police, even when perpetrators acknowledge their actions."[25] Critically, "[t]he agents can't even suggest that victims call the police themselves. Why? Because police reports can puncture Uber's carefully crafted safety -image – and open the company up to more lawsuits and liability."[26] "[E]ven in the most egregious of cases – including

---

[25] New York Times, *Why Uber Won't Call the Police, (*Dec. 22, 2021), https://www.nytimes.com/2021/12/22/opinion/uber-safety-ride-sharing.html.
[26] *Id.*

confessions of rape, armed assaults and kidnappings – Uber won't contact authorities unless a person is in immediate and present danger."[27]

184. In late 2018, Uber finally developed a "Taxonomy" to identify, categorize, and count incidents of sexual misconduct on its platform.[28] It did not do this out of genuine concern for safety, but because research showed that negative views of Uber were rising in part due to public reports of rampant sexual harassment and misogyny directed at Uber's female engineers and other corporate employees, and in part due to a continued lack of transparency regarding sexual misconduct by Uber riders in the wake of the #MeToo movement. Uber promised users improved transparency and reporting.

185. When Uber announced a commitment to transparency in 2018, it did so for the sake of public relations. It took the position that sexual assaults on Uber's platform were merely a reflection of a society-wide problem, and not a reflection on Uber's transportation system or business practices.

186. On May 15, 2018, Uber's new Chief Legal Officer, Tony West, working with new CEO Dara Khosrowshahi, announced: "[O]ur service ultimately reflects the world in which we operate—both the good and the bad. And it's clear that sexual violence remains a huge problem globally. The last 18 months have exposed a silent epidemic of sexual assault and harassment that haunts every industry and every community. Uber is not immune to this deeply rooted problem, and we believe that it is up to us to be a big part of the solution."[29]

187. The Taxonomy identified 21 categories of sexual misconduct or assault based on "real examples … reported to Uber":

---

[27] *Id.*

[28] Chad Sniffen et al., *Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault*, Raliance & The Urban Inst. (2018).

[29] Tony West, *Turning the Lights On*, Uber Newsroom (May 15, 2018), https://www.uber.com/newsroom/turning-the-lights-on/

| SEXUAL MISCONDUCT | SEXUAL ASSAULT |
|---|---|
| Staring or Leering | Attempted Touching: Non-Sexual Body Part |
| Comments or Gestures > Asking Personal Questions | Attempted Kissing: Non-Sexual Body Part |
| Comments or Gestures > Comments About Appearance | Non-Consensual Touching: Non-Sexual Body Part |
| Comments or Gestures > Flirting | Non-Consensual Kissing: Non-Sexual Body Part |
| Comments or Gestures > Explicit Gestures | Attempted Touching: Sexual Body Part |
| Comments or Gestures > Explicit Comments | Attempted Kissing: Sexual Body Part |
| Displaying Indecent Material | Non-Consensual Touching Sexual Body Part |
| Indecent Photography Without Consent | Non-Consensual Kissing: Sexual Body Part |
| Soliciting Sexual Contact | Attempted Non-Consensual Sexual Penetration |
| Masturbation / Indecent Exposure | Non-Consensual Sexual Penetration |
| Verbal Threat of Sexual Assault | |

188. Using the Taxonomy, Uber went back and tried to retroactively analyze and categorize reports of sexual misconduct reported to it from 2017 to 2018. Uber's ability to accurately do so was limited by its deficient information gathering.

189. In Uber's first Safety Report, published on December 5, 2019, Uber admitted to receiving reports of 5,981 sexual assaults (in five categories) in the United States in 2017 and 2018.[30] These included 235 rapes, 280 attempted rapes, 1,560 groping incidents, 376 instances of unwanted kissing of the breast, buttocks, or mouth, and 594 reports of unwanted kissing to another body part.

190. The sexual assaults that Uber reported to the public represent only the tip of the iceberg. Significantly, Uber reports data on sexual assaults in only five of the categories, providing zero transparency regarding the other 16 categories of sexual misconduct and sexual assault occurring on its system. As described above, there are also inherent and Uber-created limitations that affect sexual assault reporting.

191. Uber did not voluntarily publish additional data on sexual assaults after its 2019 report.

192. On December 2, 2021, the California Public Utilities Commission (CPUC) approved a settlement agreement with Uber regarding its failure to report data on sexual harassment and assault, notwithstanding CPUC demands for it. Uber agreed to pay $9 million

---

[30] Uber, *US Safety Report 2017-18* (Dec. 5, 2019), https://www.uber-assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullReport.pdf?uclick_id=f2f17920-a01a-4c4a-b1a2-abd1e253f24a

and to provide information on sexual assault and harassment to the CPUC on a going-forward basis.[31]

193.    It was another six months after this settlement, before Uber publicly released another safety report. In July 2022, it released a report covering 2019 and 2020 (a year when its ridership was decimated by the pandemic).[32]

194.    Despite a drastic reduction in total rides due to the pandemic (a decline of approximately 30-77% depending on the geographic region) Uber admitted in its 2022 report that it still received 3,824 reports of sexual assault (within the same five categories) in the United States in 2019 and 2020.[33]

195.    Despite its efforts to discourage accurate reporting of sexual misconduct and to minimize publication of such incidents, Uber has known since 2013 that its Uber users were being sexually assaulted and harassed during Uber trips.

F.    **Instead of trying to prevent sexual misconduct, Uber launders its reputation.**

196.    Uber has a tried and true strategy for dealing with controversy, especially those involving sexual misconduct: protect its reputation by offering limited and inadequate transparency and hiding behind the reputation of third parties.

197.    In 2017, bad press about Uber was piling up due to, among other things, the New Delhi assault, reports of widespread sexual harassment among employees, and rampant misogyny and "bro culture" at the top of the company.[34]

198.    Uber's goal of going public was threatened. Uber knew it needed to clean up its image.

---

[31] CPUC Press Release (Dec. 2, 2021), https://www.cpuc.ca.gov/news-and-updates/all-news/cpuc-approves-9-million-settlement-with-uber.
[32] Uber, US Safety Report 2019-20, https://uber.app.box.com/s/vkx4zgwy6sxx2t2618520xt35rix022h?uclick_id=f2f17920-a01a-4c4a-b1a2-abd1e253f24a
[33] Uber, US Safety Report 2019-20, https://uber.app.box.com/s/vkx4zgwy6sxx2t2618520xt35rix022h?uclick_id=f2f17920-a01a-4c4a-b1a2-abd1e253f24a
[34]  Susan Fowler, *Reflecting on One Very, Very Strange Year at Uber* (Feb. 19, 2017), https://www.susanjfowler.com/blog/2017/2/19/reflecting-on-one-very-strange-year-at-uber); Isaac, *Super Pumped*, at 84, 192-93.

199.    On June 12, 2017, Uber held a company-wide meeting to announce changes. At the meeting, Uber proclaimed that it was going to increase its diversity and sensitivity by adding a female board member. Board member David Bonderman chimed in that the addition of a woman to the board meant "it's much likelier [there will] be more talking on the board."[35] Though Mr. Bonderman soon resigned after his comments were reported, the fact that this attitude came from the person "working on Uber's culture after the company was rocked by scandals over claims of sexual harassment and other misbehavior"[36] demonstrates that Uber's "culture was poisoned from the very top."[37]

200.    Uber hired former Attorney General Eric Holder and his law firm, Covington & Burling LLP, to investigate Uber's culture and work-place environment.[38] Holder's investigation uncovered "a winding, repetitive list of infractions that had occurred across hundreds of global offices, including sexual assault and physical violence."[39]

201.    Holder produced hundreds of pages of findings, but only Uber's board of directors ever saw the full report.[40]

202.    Uber's primary response to the Holder report was to replace its leadership—forcing out the founding generation, including Mr. Kalanick. But, while Uber presented fresh and trusted faces to the public, such as new CEO Khosrowshahi and board member Ariana Huffington, the underlying conduct and business practices did not change. Instead, the retention of Mr. Holder and the leadership "reset" merely served to cover up the continuation of the fraud that Uber cared about safety and would work to provide a safe ride.

203.    As discussed above, after using Mr. Holder to burnish its image, Uber did not release any data on sexual assaults until December 2019.

---

[35] Mike Isaac and Susan Chira, *David Bonderman Resigns From Uber Board After Sexist Remark*, N.Y. Times (June 13, 2017).
[36] *Id.*
[37] Isaac, *Super Pumped*, at 280.
[38] Covington & Burling, LLP, *Uber Covington Recommendations*, https://www.documentcloud.org/documents/3863793-Uber-Covington-Recommendations.html
[39] Isaac, *Super Pumped*, at 271.
[40] *Id.*

204.     Uber partners with third parties, often non-profits, to use their reputation to enhance its own. These include the National Sexual Violence Resource Center, the Urban Institute, and Mothers Against Drunk Driving.

205.     Uber is not transparent about what data or information it provides to these organizations and what it withholds. These outside organizations also have no real ability to affect Uber's actions, as demonstrated by Uber's approach to the Covington-mandated Safety Reports.

206.     Uber also coopts third parties like RAINN (Rape, Abuse & Incest National Network), to hide behind messaging about how victims can protect themselves from sexual violence. Uber does this to deflect attention away from its own institutional responsibility to meet its promises to protect its drivers. Uber donates millions of dollars annually to RAINN and similar nonprofit organizations, so that Uber can appear committed to safety, so that these groups will have a conflict that prevents them from criticizing Uber or opposing it as amicus in court), and also so that Uber can influence the messages put out by those groups. On the other hand, Uber gives those groups no real influence over the way Uber does business.

207.     Indeed, Uber's partnership with safety-oriented organizations only underscores that it has voluntarily undertaken the duty to ensure a safe ride.

208.     While Uber hides behind third parties who have no power to investigate the real and complete truth of Uber's approach to sexual misconduct, and no power to alter that conduct, Uber's attitude towards courts and regulators—those actually in a position to modify Uber's conduct—is very different.

209.     For an unknown period of time, Uber deliberately deleted internal communications. The company included an entity called the "Strategic Services Group" that engaged in competitive intelligence and other unknown activities.[41] Internal communications within the Group were carried out using an app called Wickr. Wickr automatically deleted messages after a certain period of time, preventing future legal discovery.[42] The group's

---

[41] Isaac, *Super Pumped*, at 257.
[42] *Id.* at 258.

practices may also have included improperly designating documents as attorney-client privileged.[43]

210. "Employees were unnerved by mass deletion of internal emails, groups chats, and company data, carried out under an internal initiative to 'eliminate data waste' throughout all levels of the company. Internally, many believed executives wanted to cover Uber's tracks, anticipating a subpoena for some unknown future court case."[44]

211. Uber regularly flouts transparency demands placed on it by courts and regulators. Uber refused to comply with CPUC document demands for months, leading to the regulator imposing a $59,085,000 fine (reduced after settlement), and threatening to revoke Uber's license.[45]

212. Also in 2019, Uber skipped a congressional hearing aimed at examining its safety and labor practices.[46] This was after the Committee on Transportation and Infrastructure had repeatedly sought Uber's participation. Uber, instead, "suggested that [the committee] invite third party industry associations to generally talk about technology innovation in transportation."[47]

## V. **PUNITIVE DAMAGES**

213. The Plaintiff seeks punitive or exemplary damages for any claim under Tennessee law under which they are permitted.

214. Uber acted intentionally, recklessly, wantonly, maliciously, and fraudulently.

215. As alleged above, Uber knew it faced an ongoing problem of its riders assaulting or harassing its drivers. Since 2014, Uber has received frequent driver complaints about rider

---

[43] *Id.*
[44] *Id.* at 259.
[45] Joint Motion for Adoption of Settlement Agreement, July 15, 2021, *Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Servs.*, Rulemaking 12-12-011 (Cal. Pub. Util. Comm'n)
[46][46] Siddiqui, Faiz. "Congress wanted to grill Uber and Lyft on safety. The companies blew them off." The Washington Post. Oct. 16, 2019, https://www.washingtonpost.com/technology/2019/10/16/congress-wants-grill-uber-lyft-safety-companies-are-blowing-them-off/s.
[47] Committee on Transportation and Infrastructure Letter to Uber CEO Dara Khosrowshahi, Oct. 14, 2019, https://democrats-transportation.house.gov/imo/media/doc/2019-10-14%20LTR%20to%20Khosrowshahi%20CEO%20Uber.pdf

sexual misconduct, including sexual assault and rape, it has been repeatedly notified of police investigations of the criminal sexual conduct of riders against Uber drivers, and it has been the subject of numerous civil suits and arbitrations alleging the sexual harassment and sexual assault of Uber's Drivers by Uber's passengers.

216. Nevertheless, even though Uber was fully aware of its sexual misconduct problem it failed to take safety precautions to protect its passengers.

217. Even after Uber was aware of widespread sexual misconduct on the part of its riders, Uber and its executing officers made the conscious decision not to implement measures to inform drivers of the risk of sexual assault and deploy known preventative measures to stop sexual assault of Uber Drivers by riders.

218. Prioritizing profits over safety, Uber and its executive officers also made the conscious decision not to warn its Drivers or users of the risk of being assaulted, even after Uber and its leadership were fully aware of this risk.

219. Safety precautions such as women preferred trips, enhanced electronic monitoring systems; a zero-tolerance program for sexual assault and public guidelines mandating immediate removal of passengers from the system; a zero-tolerance policy for fraternizing with Drivers; creating and instituting a system encouraging reporting; adequate monitoring of driver complaints by well-trained and effective customer-service representatives; warnings to drivers of the dangers of being attacked by Uber passengers; and cooperation with law enforcement when a rider attacks a driver would have cost Uber money and reputational damage. Because of this, Uber, at the direction of its corporate officers, decided not to implement such precautions and instead has continued to place its drivers at greater risk of kidnapping, sexual assault, harassment, rape, and exploitation by Uber's own riders.

220. Prioritizing profits over passenger safety, Uber and its executive officers acted, and continue to act, recklessly and in knowing, conscious disregard of the safety of its drivers, including that of the Plaintiff and the public.

221. Uber also misrepresented the safety of its rides to the Plaintiff and the public, intentionally and actually inducing reliance on those statements and omissions.

## VI.  STANDING TO SEEK INJUNCTIVE RELIEF

222.  It is plausible that the Plaintiff will seek to drive for Uber in the future and necessarily will rely on Uber's obligations and representations regarding safety.

223.  Transportation companies like Uber are a ubiquitous part of modern life in this country and the Plaintiff has relied (or relies) on Uber for income.

224.  The Plaintiff reasonably expects to be able to use Uber's product in the future. Conversely, it would be a concrete and significant injury if they were precluded from accessing those common carrier services.

225.  The widespread nature of sexual misconduct on Uber's platform, paired with Uber's refusal to take adequate corrective measures, creates a substantial risk of future harm to the Plaintiff.

226.  The injuries to the Plaintiff stem from Uber's established corporate policies, further demonstrating a likelihood of repetition in the immediate future.

227.  The Plaintiff also suffers a concrete, particularized injury because they plausibly desire to purchase Uber's product as advertised, i.e., as a safe ride. As constituted, Uber's rides are not safe and so are not as advertised.

228.  Finally, the Plaintiff suffers a real and immediate threat of future injury because Uber's lack of adequate protections against sexual assault constitutes a barrier that deters The Plaintiff from using the product and thus restricts their access to employment.

229.  The threat of future injury is directly traceable to Uber's policies regarding sexual misconduct and is redressable if those policies are changed.

## VII.  CLAIMS

230.  Except as otherwise indicated, The Plaintiff pleads claims under any applicable state laws.

231.  Each claim incorporates all allegations above.

### B.  Negligence

232.  The Plaintiff pleads claims for negligence under all theories that may be actionable under any applicable state laws.

233. Uber owed the Plaintiff a duty to act with reasonable care.

a. The factors courts consider in assessing whether a defendant owes a duty of care all support finding a duty here: (1) the Plaintiff's injuries were a foreseeable risk of Uber's business model and practices; (2) the Plaintiff's injuries are certain and compensable; (3) there is a close connection between Uber's conduct and the Plaintiff's injuries; (4) Uber's conduct, relative to the but-for world where it acted reasonably, had no social utility; (5) Uber is in the best position to modify its conduct to prevent future harm; (6) the burden to Uber of upholding its duty is reasonable in light of the potential to avoid injuries; and (7) Uber is in a strong position to insure or self-insure.

b. Uber owed a duty because it distributed and promoted its platform while on notice of acts of widespread sexual assault and harassment committed by its riders against its drivers.

c. Uber owed a duty because its prior conduct created a risk of harm to the Plaintiff, and caused them actual harm.[48]

d. Uber owed a duty because the risk of harm to the Plaintiff was embedded in, and an inherent component of, its negligent business practices.

e. Uber owed a duty because it controlled the riders, including the rider who sexual assaulted the Plaintiff.

f. Uber owed a duty because it designed and controlled the transportation experience and environment for both drivers and passengers.

g. Uber owed a duty because it voluntarily undertook to provide a "safe ride" to drivers, its failure to exercise case increased the risk of harm to drivers, and the harm was suffered because of drivers' reliance on Uber's undertaking.[49]

h. Uber owed a duty because it offered and contracted to provide trips to the Plaintiff, and this offer carried an implied warranty that it would provide rides safely.

---

[48] *See* Restatement (Second) of Torts §§ 321, 322
[49] *See* Restatement (Second) of Torts §§ 323, 324A.

i. Uber owed a duty because it retained control over its riders, including strictly controlling who would be paired with the Plaintiff, and exercised that retained control in a manner that affirmatively contributed to the Plaintiff's injuries by making sexual assaults in Uber vehicles dramatically more likely.[50]

j. Uber owed a duty because it has a special relationship with the Plaintiff, who was an Uber Driver at the time she was raped by the Uber Rider:

i. Uber has a special relationship with its drivers since Uber, like an innkeeper, business proprietor, common carrier, or train station, exercises control and has the ability to exercise control over the environment the driver occupies. In Uber's case, this environment is not merely physical but also consists of an "online platform" which is a type of digital environment. Uber is in a superior position relative to its drivers to provide a safe (physical and technological) environment.

ii. Uber has a special relationship with its drivers since Uber derives a special benefit from its drivers' dependence and reliance upon Uber. Uber makes a financial profit from this relationship.

iii. Uber has a special relationship with its drivers because it collects large amounts of detailed data on their location and movements, and, on information and belief, utilizes that data for its own commercial purposes, including potentially selling the data to third parties.

iv. Uber has a special relationship with its drivers because, based on its representations, undertakings, and business model, Uber stood in the shoes of the drivers. Passengers pay Uber, not the driver, and get a receipt from Uber, not the driver. All communications about the experience come from Uber. Drivers have no ability to identify or contact their rider outside of the channels controlled exclusively by Uber.

v. The special relationship between Uber and its drivers has defined boundaries since it exists specifically between Uber and those individuals who use Uber's application to request a ride, as opposed to all members of the public.

---

[50] *See* Restatement (Second) of Torts § 414.

k.       Uber owed a duty because it had a special relationship with its drivers and so was obligated to prevent them from being harmed by passengers.[51]

l.       Uber owed a duty to prevent riders from harming drivers because the Riders (1) were on Uber's premises, (2) were using Uber's product, and (3) Uber knew or had reason to know it has the ability to control the riders and of the necessity and opportunity for exercising such control.[52]

m.       Uber owed a duty to prevent riders from harming drivers, including from intentionally doing so, because (1) Uber permits riders to use its chattel—the Uber product, (2) Uber was virtually present in the vehicles, and (3) Uber knew or had reason to know Uber had the ability to control the ridres and of the necessity and opportunity for exercising such control.[53]

n.       Uber owed a duty because it took charge of drivers whom it knew or should have known were likely to be the subject of sexual assaults and other harm on its platform.[54]

o.       Uber failed to take reasonable precautions to protect vulnerable female drivers, including the Plaintiff, from the foreseeable and known risk of assault or harassment by its riders. If Uber had used the highest degree of care, Uber could have prevented or reduced the likelihood of the sexual assault of its driveres, including the Plaintiff.

234.     As a proximate result of Uber's negligence, the Plaintiff was assaulted or harassed by an Uber rider and suffered psychological and physical harm.

235.     As a proximate result of Uber's negligence, the Plaintiff suffered economic and non-economic damages.

**C.       Fraud and Misrepresentation**

236.     The Plaintiff pleads both claims for affirmative misrepresentation and misrepresentation by omission.

---

[51] *See id.*
[52] *See* Restatement (Second) of Torts § 317.
[53] *See* Restatement (Second) of Torts § 318.
[54] *See* Restatement (Second) of Torts § 319.

237.     Uber represented to the Plaintiff and the general public that safety was Uber's priority, and that Uber's goal was to provide a "safe ride."

238.     Uber made intentional misrepresentations of fact to all users of the Uber App, including the Plaintiff.

239.     These statements were false when made.

240.     Uber failed to disclose the truth that Uber prioritized growth and driver supply over passenger safety.

241.     Uber failed to disclose the truth that Uber failed to adequately protect the Plaintiff against sexual assault or harassment committed by riders.

242.     Uber had a duty to disclose the truth of its priorities and lack of adequate safety mechanisms.

        a.     Uber had a duty to disclose because, as alleged above, it had a special relationship with the Plaintiff and its other drivers.

        b.     Uber had a duty to disclose because it had a special relationship with the riders, including the rider who sexually assaulted the Plaintiff.

        c.     Uber had a duty to disclosure because of its exclusive, superior knowledge of the incidents that occurred on its transportation network.

        d.     Uber had a duty to disclose due to its active concealment of the safety conditions of Uber rides.

        e.     Uber had a duty to disclose because of the dangerous conditions of the Uber product.

        f.     Uber had a duty to disclose because Uber made affirmative incomplete misrepresentations with knowledge of undisclosed facts that materially qualified the facts disclosed or rendered the disclosed facts likely to mislead the Plaintiff.

243.     These representations and omissions regarding safety were made to the Plaintiff, an Uber driver, through various channels, including but not limited to: retail advertising, emails, social media, and Uber's own website, app store product placement, and Uber App.

244. While the precise wording of different communications and advertising varied, Uber's messaging consistently presented and reinforced a unique selling proposition driving for Uber was safe.

245. Uber intended that its marketing proposition reach the widest possible audience, including every driver, and especially including women drivers. Uber's marketing efforts reached the Plaintiff.

246. Uber intended that every driver, including the Plaintiff, rely on its safety marketing.

247. Regardless of Uber's intent, it can be presumed that every Uber driver, especially a vulnerable female driver like the Plaintiff, assumes Uber is doing everything it can to provide a safe trip and relies on that assumption in deciding to use Uber's product.

248. As a result of relying on Uber's misrepresentations and omissions, the Plaintiff was assaulted or harassed by an Uber rider, and suffered economic and non-economic damages.

### D. Negligent Infliction of Emotional Distress

249. The Plaintiff incorporates all allegations pleaded under the Negligence claim.

250. Each of the asserted duties owed by Uber included the duty to exercise reasonable care to avoid causing the Plaintiff emotional distress.

251. In particular, Uber owed a duty because it had a special relationship with the Plaintiff and its drivers.

252. Uber also owed a duty because it should have realized that its conduct involved an unreasonable risk of causing emotional distress and, from facts known to it, should have realized that the distress might result in illness or bodily harm of the Plaintiff.[55]

253. As a proximate result of Uber's negligence, the Plaintiff was assaulted or harassed by an Uber rider and suffered severe emotional distress.

---

[55] *See* Restatement (Second) of Torts § 313.

**E.**   **Other Non-Delegable Duties to Provide Safe Transportation**

254.    This claim includes liability for each breach of Uber's non-delegable duty to provide safe transportation, whether acts constituting the breach were committed by Uber or by its drivers.

255.    Uber's non-delegable duties are grounded on two independent bases: (1) its own representations to the public, voluntarily undertaking to provide safe transportation; and (2) the nature of its business.

256.    Uber holds itself out to the public as providing safe transportation. Drivers like the Plaintiff reasonably believe that, when they drive for Uber, they are being paired with a rider who is reasonably safe. Thus, Uber has a non-delegable duty to supply safe transportation, just as if Uber were supplying that transportation itself, whether or not it in fact engages independent contractors or Uber employees to provide that transportation.[56]

257.    Uber, by pairing riders to drivers on its platform, was engaged in work involving a special danger of sexual misconduct, which Uber knew or should have known was inherent in the transportation business it operated, and which Uber should have contemplated when agreeing to employ or otherwise contract with Uber Drivers. Thus, Uber has a non-delegable duty to protect the Plaintiff and other drivers against the danger of sexual misconduct, and Uber is liable for the failure to protect drivers against this danger, and for their active and intentional breach of Uber's duty of protection.[57]

258.    Uber knew or should have known that female drivers being paired with intoxicated male riders was an abnormally dangerous activity. Thus, Uber has a non-delegable duty to protect the Plaintiff and its drivers against the dangers of such transportation, including sexual assault. Uber is thus subject to liability to the same extent as a rider is for physical harm caused by sexual assault during transportation.[58]

259.    Uber, which transports persons for profit in private vehicles, was and is engaged in a type of activity that Uber should have known would likely create a peculiar risk of physical

---

[56] Restatement (Second) of Torts § 429
[57] Restatement (Second) of Torts § 427 (Negligence as to Danger Inherent in the Work).
[58] Restatement (Second) of Torts § 427A (Work Involving Abnormally Dangerous Activity).

harm to drivers in the absence of special precautions. As such, Uber owed to its drivers a non-delegable duty to use such precautions.[59]

260.    Uber, which offers transportation to the public and creates a public digital environment for that purpose, was engaged in work that unless carefully done involved a risk of making this environment unsafe for use by members of the public. As such, Uber owed a non-delegable duty to keep its transportation environment safe for drivers' use.[60]

261.    Statutes and regulations require that Uber use specific safeguards and precautions for the safety of its users. As such, Uber owed to its Drivers, like the Plaintiff, a non-delegable duty to provide those safeguards and precautions.[61]

262.    Uber was and is engaged in transportation activities that are illegal unless licensed. As such, Uber owed to its drivers, like the Plaintiff, a non-delegable duty to see that due care was used in their protection.

263.    Uber contracts with drivers to provide them with trips, and its drivers carry Uber's passengers pursuant to the contract between Uber and the driver. As such, Uber owed to its drivers a non-delegable duty to see that due care was used in their protection.

264.    Uber owed to its drivers a non-delegable duty to see that due care was used in their protection, including in protecting them against sexual assaults. This was the type of duty that, even if Uber contracted its performance to an agent, employee, or third party, Uber would be subject to liability for the failure of such agent, employee, or third party to perform the duty.[62]

265.    As a legal and proximate result of the breach of Uber's non-delegable duty to protect drivers from sexual assault, the Plaintiff was assaulted, battered, harassed, or otherwise attacked by an Uber Rider, which humiliated, degraded, violated, and robbed the Plaintiff of her sense of dignity and personal safety. The attack on the Plaintiff caused the Plaintiff to suffer physical or psychological harm.

---

[59] Restatement (Second) of Torts § 416 (Work Dangerous in Absence of Special Precautions).
[60] Restatement (Second) of Torts § 417 (Work Done in a Public Place).
[61] Restatement (Second) of Torts § 424 (Precautions Required by Statute or Regulation).
[62] Restatement (Second) of Agency § 214.

266.     As a direct and proximate result of Uber's breach of its non-delegable duties, the Plaintiff suffered economic and non-economic damages.

**F.     Uber Drivers are Employees under the Fair Labor Standards Act and Uber did not provide the Plaintiff with a fair minimum wage**

267.     The Plaintiff is an Uber Employee under the Fair Labor Standards Act and was not paid a fair minimum wage under Tennessee Law.

268.     Uber pays its drivers substandard wages, which violates the Fair Labor Standards Act ("FLSA") because drivers should be considered employees. The Plaintiff seeks compensation for unpaid wages owed under the FLSA. The purpose of the FLSA is to protect covered workers from substandard wages and oppressive working hours.

269.     The statutory scheme makes the wage and hour provisions applicable to "employees." Employee is defined as one "employed," and "employ" is defined as "suffer or permit to work." 29 U.S.C. § 203(e) & (g).

270.     In determining whether a work is sufficiently dependent to be considered an employee under the FLSA, courts apply a five-factor test called "the economic realities test. The five factors considered by the courts in assessing economic independence are:

    a.   The degree of control exercised by the alleged employer;
    b.   The extent of the relative investments of the employer and the employee;
    c.   The degree to which the alleged employer determines the alleged employee's opportunity for profits and losses;
    d.   The skill and initiative required to perform on the job; and
    e.   The permanence of the relationship between the employer and employee.

271.     Uber drivers are employees and agents of Uber. Uber reserves the right to control the activities of Uber drivers. Uber controls the prices charged to customers, controls contact with the customer base, controls the ability of drivers to see where they will be driving before they accept a ride, and reserves the right to terminate drivers with or without cause.

272.     Uber retains and in fact exercises overwhelming control over its drivers.

    a.   Uber controls the App which all drivers must use to receive, accept, and complete rides with passengers.

b. Uber sets the fare prices, including additional fees and costs imposed on the passenger, any opportunity for bonus and incentive payments to the driver, and any promotional offers or discounts for the passenger.

c. Uber retains control over primary passenger contact and full control over the passenger's contact information via the App.

d. Uber monitors the driver's route and determines fees and costs for any modification or cancellations, including provisions related to driver deviations or delays (which may result in modified charges and notices to the passenger), and instructing drivers on where to pick up and drop off passengers in relation to their destination.

e. Uber retains the right to terminate drivers at will and impose disciplinary actions if drivers fail to comply with Uber's rules.

f. Uber imposes a code of conduct on drivers, including requiring drivers to dress professionally and limiting the number of times a driver may contact a passenger.

g. Uber instructs drivers on how to maintain and operate their vehicle during an Uber ride.

h. Uber maintains the driver rating system, which displays the average star rating for each driver.

i. Uber maintains customer service support where customers can report driver-related complaints.

j. Uber drivers do not require any specialized skills or training.

k. Uber drivers' job duties of driving passengers to and from destinations is the essential core of Uber's business.

**G.** **Strict Products Liability (Failure to Warn and Design Defect)**

273. Uber manufactures, designs, sells, markets, advertises, labels, and makes available in the stream of commerce the Uber App, which is a self-contained computer program or software package that runs inside of an operating system.

274.     Uber Drivers download the Uber Driver App from a distribution source, such as the Apple Store. The Uber Driver App uses Uber's algorithms, data, and physical hardware. The passenger version of the Uber App, driver version of the Uber App, and Uber's backend technology infrastructure "communicate" and work together to facilitate the exchange of data, "match" passengers and drivers using different versions of the app, transmit payments, obtain and store "ratings" for drivers and passengers, and perform other functionalities as developed, implemented, updated, modified, or controlled by Uber.

275.     When end users or consumers download the driver or passenger version of the Uber App onto their mobile devices, they download a computer program or software package which then must be installed on their mobile device, in much the same way that individuals who purchase the Microsoft Office software package either download the software to install it or install it off of a disk onto their computers.

276.     When end users or consumers who have installed the Uber App on their mobile devices open the Uber App, they are interacting with the user interface on the "frontend." The frontend includes visual elements (for example, buttons, check boxes, and text in natural language). The frontend or user interface is what allows end consumers to actually interact with the Uber application and to make financial transactions through it. That is, this is the point of human-computer interaction. Each and every feature that end users or consumers interact with on the front end is directly and necessarily controlled by Uber's physical servers (its backend technology infrastructure and technical specifications). The backend infrastructure is what actually makes the Uber App work and has, at all relevant times, included identifiable, tangible elements, including but not limited to physical servers located at data centers around the country.

277.     Every feature of the Uber App was designed, developed, implemented, and controlled exclusively by Uber.

278.     Unlike social media platforms, the Uber App does not consist of user-controlled content.

279.     The features and functionality of the Uber App, including but not limited to all aspects of the user interface and all subsurface algorithms and coding, were designed, developed, implemented, coded, and controlled by Uber.

280.     Uber makes all decisions regarding the technical specifications and design of the Uber App, including but not limited to the user interface and subsurface algorithms and coding that operate as part of Uber's backend infrastructure.

281.     Uber controls who, when, and how the Uber App is used and exercises this control through the features and functionalities of the app which were designed, developed, coded, and implemented by Uber.

282.     For example, Uber is in complete control of which riders get matched with which drivers and whether passengers and drivers may use the app.

283.     Uber also has complete control over the text of all communications sent to drivers or passengers who contact Uber for support of any kind.

284.     Uber also sets rates which are charged for each ride and further sets the amount drivers earn for each ride.

285.     Uber retains complete control over modifications, updates, and bug fixes to the code or algorithm that are released for the Uber App. As with traditional software packages, end users or consumers must download and install updates to the Uber App software when they are released.

286.     Uber made design, guarding, and warning choices which have affected the experience of end users of the Uber App by developing, updating, or modifying its technology infrastructure to develop, update, or modify the Uber App or features of the Uber App that are available to Uber Drivers, including the Plaintiff on the user interface. Specifically, Uber has controlled what features, including but not limited to buttons, information sharing, or camera usage, are involved in the end user experience of the Uber app.

287.     Uber controlled the user experience for end users of the Uber App (both drivers and passengers), by developing, updating, and modifying its technology infrastructure on the backend, to develop, update, or modify the Uber App and or features of the Uber App that are

available to end consumers, including the Plaintiff, on the user interface. Specifically, Uber has controlled what features, including but not limited to buttons, choices, information sharing, or camera usage, are involved in the end user experience of the Uber app.

288. Uber made decisions about and controlled all text that appears when end users access the Uber App or Uber website, by developing, updating, or modifying its technology infrastructure on the backend, to develop, update, or modify the Uber App and or website. Specifically, Uber made decisions about what statements, representations, or warnings, if any, would or would not appear in natural language on the frontend of the Uber App or Uber website that end consumers, including the Plaintiff, interact with.

289. Uber made decisions concerning the use of its algorithms, which on information and belief it considers proprietary to it, and which it developed using programming language. Uber's algorithms operate on the backend of Uber's technology infrastructure and utilize data to "match" riders and drivers. Uber has at all times been responsible for the development, updating, and modification of its algorithm, which directly affects or affected the experience of end users, including the Plaintiff, interacting with the Uber app.

290. Uber made design choices that defined the experience of end users of the Uber app, by developing, updating, or modifying its technology infrastructure on the backend, to develop, update, or modify the Uber App and or features of the Uber App that control the use and experience of end users including riders and drivers. This includes but is not limited to features related to Uber's "rating" system by which users, at the completion of the ride interact with the Uber App interface to select a rating from one to five stars for the rider or driver and the reporting system, by which users can use their keyboards to submit complaints or reports to Uber in natural language. This data is then transmitted to Uber's servers at various locations and used, among other things, for future matching purposes.

291. Uber facilitated the exchange of data and information between the user interface of the driver or rider versions of the Uber App and its backend technology infrastructure.

292.    As the designer of a product, Uber had the duty to conduct a hazard analysis to identify risks associated with its product and then to mitigate those risks in accordance with industry standards for severity and frequency, among other things.

293.    Specifically, as the designer of a product, Uber had a duty to control for risks in accordance with the design hierarchy by (1) designing away the risks; (2) guard against any risks that cannot be designed out; and (3) warn against any risks that could not be designed away or guarded against.

294.    Uber did not conduct an adequate hazard analysis and did not adequately control for risks associated with its product.

295.    It was reasonably foreseeable to Uber, as the designer of the Uber App, that end users or consumers were at risk of sexual harassment, assault, kidnapping, or other sexual misconduct while using the Uber app.

296.    However, Uber failed to design away the risks of sexual harassment, assault, kidnapping, or other sexual misconduct while using the Uber app.

297.    Uber has publicly acknowledged that thousands of passengers and drivers have been sexually assaulted or harassed while using the Uber app.

298.    As discussed above, the exact number of sexual assaults is unknown due to underreporting and Uber's failure to disclose the true number of sexual assaults reported to it.

299.    Uber also failed to mitigate the risks of sexual harassment, assault, kidnapping, or other sexual misconduct while using the Uber app.

300.    Specifically, Uber failed to design away the risks associated with using its app by, among other things, failing to provide and require the installation of dash cameras in each vehicle and failing to provide other audio or video monitoring of rides, and failing to allow women preferred trips for Uber drivers.

301.    Uber similarly failed to guard against the risk of risks of sexual harassment, assault, kidnapping, or other sexual misconduct by, among other things,

    a.    Failing to design an effective safety-focused reporting system to capture safety data so it could be acted on;

b.    Failing to permit drivers to select passengers of the same gender;

c.    Failing to enact and appropriately enforce a zero tolerance policy toward riders with a history of inappropriate behavior;

d.    Failing to appropriately monitor rides to detect known patterns of sexual assault, harassment, kidnapping or other forms of sexual assault, including but not limited to using existing GPS and predictive technology to monitor and respond passengers who were an increased safety risk to drivers;

e.    Failing to offer timely support during unsafe trips; and

302.    Further, Uber failed to provide adequate warnings to users of its app by failing to warn them to the actual risk of sexual harassment, assault, kidnapping, or other sexual misconduct.

303.    As a result, the Plaintiff was unable to make an informed decision about whether to use Uber Driver App.

304.    Instead of warning users that they faced a risk of sexual misconduct, Uber instead represented that it provided a "safe" trips that safety was designed into its product. Thus, users did not know the true risk of sexual harassment, assault, kidnapping, or other sexual misconduct while using the Uber app.

**1.    <u>Design Defect</u>**

305.    At all relevant times, Uber manufactured, designed, marketed, advertised, labeled, produced, sold, and made available in the stream of commerce the Uber application.

306.    Drivers, including the Plaintiff, purchased or downloaded the Uber application from app stores on their devices, including but not limited to the Apple Store or Google Play Store.

307.    The Uber application was in a defective condition unreasonably dangerous to users, including the Plaintiff.

308.    Uber was engaged in the business of manufacturing, designing, producing, marketing, advertising, labeling, selling, and making the Uber application available to the public as a product in the stream of commerce.

309. As the designer of the Uber app, Uber has superior knowledge and was in the best position to understand the risks and hazards associated with the product. The risks associated with using the Uber application that form the subject of this Complaint were largely unknown to Uber Driers, and Uber Drivers relied upon Uber and its superior knowledge when they decided to use the Uber application to obtain trips.

310. The Uber application was expected to and did reach the end users without substantial change in its condition. The end users were members of the public, including the Plaintiff, who interacted with the interface of the Uber application to obtain rides as drivers.

311. The Uber application was dangerous to an extent beyond that contemplated by the ordinary consumer who purchases or downloads it.

312. The Uber application created a risk of harm to persons that was not ordinarily expected by users or consumers, including the Plaintiff. Specifically, Uber Driers were at a risk of sexual harassment, sexual assault, kidnapping, or other sexual misconduct while using the Uber App and the risk of this harm was not expected by the ordinary user or consumer of the Uber application.

313. The risk of sexual harassment, sexual assault, kidnapping, or other sexual misconduct against the Plaintiff was not reasonably foreseeable to the ordinary user or consumer, including the Plaintiff.

314. Uber Drivers could not know the risk of sexual harassment, sexual assault, kidnapping, or sexual misconduct that users of the Uber App face because, as set forth above, Uber does not notify law enforcement when it receives reports of sexual harassment, sexual assault, kidnapping, or other sexual misconduct involving the Uber app; Uber's own Safety Reports, published only for limited time periods, provide data on just five of twenty-one categories of sexual misconduct; and Uber has, since its inception, marketed itself as the provider of a "safe" trips and as a company with adequate safety features for drivers, including the Plaintiff.

315. The foreseeable risks of harm posed by the Uber app, including sexual harassment, sexual assault, kidnapping, or other forms of sexual misconduct, could have been

reduced or avoided by the adoption of a reasonably alternative design by Uber, as set forth in the preceding paragraphs.

      a.     The Uber App was designed to operate on smartphones which are equipped with cameras and microphones. Numerous other mobile applications interact with the smartphone's preexisting hardware to operate cameras or microphones in conjunction with use of the application (for example, Snapchat, Instagram). This technology is not only available, but widely used and could be adopted as part of Uber's technology infrastructure. Alternatively, when individuals sign up to drive with Uber, the driver version of the Uber App includes a feature to have a camera shipped directly to the driver's home address; this same feature could be used to ship dash cameras to drivers.

      b.     The Uber App was been designed to assess risk of Uber Users, including the risk to an Uber Driver from a potential Uber passenger. The Uber system has technology to reduce high risk trips for drivers, but at the time of the assault to the Plaintiff, Uber did not use this technology to appropriately reduce the risk to the Plaintiff.

316.    Implementation of reasonable and feasible alternative designs would not impair the usefulness of the Uber application or affect the cost to Uber.

      a.     Uber already employs a matching algorithm designed to connect passengers and drivers. The algorithm accounts for the distance between prospective passengers and drivers and whether the passenger has given the driver a one-star rating in the past. The addition of an option to allow female drivers to select female riders would not require substantial modification of the existing algorithm.

317.    The Uber App was designed, maintained, and updated by large teams of data scientists, user experience researchers, and similar professionals and includes subsurface algorithms and systems and complex code. Many product features, including but not limited to the inner workings of Uber's algorithms, are unobservable on the frontend. Discovery will reveal additional detail about the defects to the functionalities of the features of the product.

318.    As a proximate result of Uber's acts and omissions, the Plaintiff suffered both economic and non-economic damage.

## 2.   Failure to Warn

319.   At all relevant times, Uber manufactured, designed, produced, marketed, advertised, labeled, sold, and made available in the stream of commerce the Uber application.

320.   Drivers, including the Plaintiff, purchased or downloaded the Uber application from "app stores" on their devices, including but not limited to the Apple Store or Google Play Store.

321.   The Uber application was in a defective condition unreasonably dangerous to users, including the Plaintiff.

322.   Uber was engaged in the business of manufacturing, designing, producing, selling, and making the Uber application available to the public as a product in the stream of commerce.

323.   The Uber application was expected to and did reach the Plaintiff without substantial change in its condition. The end users were members of the public, including the Plaintiff, who interacted with the interface of the Uber application to obtain rides as passengers.

324.   Uber had a duty to warn users and consumers, including the Plaintiff, that using the Uber App in the ordinary, customary, and reasonably foreseeable manner posed a danger to users and consumers. Specifically, Uber had a duty to warn users and consumers that when using the Uber App or interacting with the Uber App interface, users were in danger of sexual harassment, sexual assault, kidnapping, or other sexual misconduct.

325.   Uber had a duty to warn users and consumers that the features of the Uber App posed a risk of harm to users and consumers, including the Plaintiff, who used the Uber App in a reasonably foreseeable manner. For example:

a.   Uber had a duty to warn users, including the Plaintiff, that the matching algorithm could pair drivers with passengers who had a criminal history; a history of receiving low- or no-star ratings from drivers; or a history of being the subject of reports or complaints from drivers.

b.   Uber had a duty to warn users including the Plaintiff that when interacting with the interface of the Uber app, including but not limited to the use of buttons and screens to

order a ride, which in turn resulted in an exchange of information and data on the backend of Uber's technology infrastructure, Uber may pair the driver individuals who posed a risk of harm, including sexual harassment, sexual assault, kidnapping, or other sexual misconduct.

        c.    Uber had a duty to warn users and consumers, including the Plaintiff, that they were at a risk of being sexually harassed, sexually assaulted, kidnapped, or subjected to other sexual misconduct when using the Uber App or otherwise interacting with the user interface of the Uber app.

326.    Uber failed to provide any warning to the users and consumers of the Uber app, including, the Plaintiff, regarding the risk of sexual harassment, sexual assault, kidnapping, or other sexual misconduct. In particular, Uber failed to provide any warning of the risks, detailed in the preceding paragraphs, that users and consumers, including the Plaintiff, faced while using the Uber App or otherwise interacting with its user interface.

327.    To the extent Uber can be construed to have provided any warning regarding the risks described in the preceding paragraphs, the warning was inadequate.

328.    To the extent Uber can be construed to have provided any warning regarding the risks described in the preceding paragraphs, the warning was mitigated by Uber's representations that Uber prioritized the safety of users and consumers, including the Plaintiff, "designed" safety into the user experience, and provided a "safe" ride or trip.

329.    The breach of Uber's duty to warn users and consumers of the risks detailed in the preceding paragraphs proximately caused the Plaintiff's injuries.

330.    Specifically, because Uber failed to warn the Plaintiff that they were at risk of sexual harassment, sexual assault, kidnapping, or other sexual misconduct when using the Uber App or interacting with the Uber app's user interface, the Plaintiff used the Uber App and were sexually harassed, sexually assaulted, kidnapped, or otherwise subjected to sexual misconduct.

331.    Had Uber warned users and consumers, including the Plaintiff, of the risks detailed in the preceding paragraphs associated with use of the Uber App and interaction with the Uber user interface, the Plaintiff would not have used the Uber App.

332.    As a direct and proximate result of Uber's failure to provide adequate warnings, the Plaintiff has suffered physical and emotional damages.

### 3.    Product Liability Acts

333.    To the extent any claims above are subsumed by Tennessee product liability statutes, The Plaintiff assert all design defect and failure-to-warn claims authorized by those statutes.

## VIII.  Prayer for Relief

334.    The Plaintiff respectfully request the following relief:

- Finding of Gross Negligence against the Uber Defendants;
- Actual Damages above the jurisdictional minimum of the Court:
- Entry of judgment in their favor;
- Economic compensatory damages;
- Non-economic compensatory damages;
- Physical pain and suffering in the past and future;
- Mental anguish in the past and future;
- Reasonable and necessary cost of medical care and treatment past and future;
- Physical impairment and disfigurement in the past and future;
- Exemplary damages;
- Punitive and exemplary damages;
- Attorneys' fees and costs;
- Pre-judgment and post-judgment interest;
- Appropriate declaratory, injunctive, and equitable relief; and
- Such other and further relief the Court may deem proper.

## IX.    JURY DEMAND

335.    The Plaintiff respectfully requests and demands a trial by jury.

Dated: September 5, 2025

Respectfully submitted,

JOHNSON LAW GROUP

By: /s/ *Russell W. Lewis, IV*
Russell W. Lewis, IV
Tennessee Bar No. 024570
1019 16th Ave South
Nashville, TN 37212
Telephone: 615-200-1122
Facsimile: (800) 731-6018
Service: Rlewis@johnsonlawgroup.com

Bret Stanley
Texas Bar No. 24075116
(Attorney Admission in Middle District of
Tennesse to be filed)
2925 Richmond Ave., Suite 1700
Houston, Texas 77098
Telephone: (713) 626-9336
Toll Free: (800) 624-8899
Facsimile: (800) 731-6018
Service: bstanley@johnsonlawgroup.com

Attorneys for the Plaintiff